# SUPREME JUDICIAL COURT

### FOR THE

## COUNTY OF ESSEX, NOVEMBER TERM 1840, AT SALEM.

**PRESENT:**

Hon. LEMUEL SHAW, Chief Justice.
Hon. SAMUEL PUTNAM,
Hon. SAMUEL S. WILDE, } Justices.
Hon. CHARLES A. DEWEY,

---

## SAMUEL GILES & another *vs.* THE EAGLE INSURANCE COMPANY.

A vessel was insured in the coasting trade, back and forth one or more fishing voyages, the insurers to be liable for general average, however small. The vessel went ashore in a storm, and the crew boarded on shore and board was paid for them, but they were not dismissed from the vessel. By the labor of the master and crew, and the labor of others who were hired for the purpose, the vessel was got off and fitted to sail, and she returned to her home port. Part of the outfits of the vessel were sold by the master, at the place where she went ashore, to raise money to pay for getting her off, &c., he having no other means of raising money for that purpose.

*Held,* that the labor and board of the master and crew, while getting off the vessel, were not a general average, and that the insurers were not liable therefor, but that they were liable for the labor, &c. of the persons hired to assist the master and crew, and for the loss on the sale of the outfits — these being a general average.

Where by the perils insured against a vessel receives a strain which alters her shape so that she cannot be perfectly repaired without rebuilding her, and her value is thereby diminished, the underwriters are answerable, to the extent of such diminished value, in addition to the expenses of repairs, although the vessel is made seaworthy by the repairs, and is afterwards insured at the same premium and the same valuation as before the injury.

Insurers are not liable for the expense of the survey of a damaged ship, made after her return to her home port.

THIS was an action on a policy of insurance, dated April 3d, 1837, by which the plaintiffs were insured " $2500 on schooner

Good Hope and appurtenances, to be employed in the coasting trade of the U. States until May 15th, 1837, and back and forth one or more fishing voyages or fares, at and from Gloucester, from May 15th to November 15th, 1837." There was a provision in the policy that the assurers were not to be liable for partial loss on any articles, or on vessel or freight, under five per cent. excepting, in all cases, general average.

The case was tried before *Dewey,* J. whose report was as follows : The Good Hope sailed from Gloucester, in good order and condition, within the time specified in the policy, for the Bay of Chaleur, on a fishing voyage. On the 12th of September, 1837, expecting a storm, she ran, with five other schooners, into Chitecamp Harbor, and anchored. On the 13th, a heavy gale set in, and on the 14th, it blowing directly into the harbor, she dragged her anchors and went ashore, as also did four of the other schooners. She went ashore in the most favorable place and manner ; the sea made a breach over her, and she soon became imbedded among the rocks. The wind and tide abating, the crew got out some large rocks from her bed, that she might lie smoother. The next night she thumped again. The fish and barrels, and every thing on board, were got on shore as soon as possible, and a survey was called the next morning. The crew boarded on shore, and board was paid for them, after the fish and barrels were landed. By the labor of the crews of the Good Hope and of five other schooners, and of some inhabitants from the shore, according to the advice of the survey, in five days' time she was got off ; the men laboring night and day when the tide would serve : The captain and crew, by eight days' further labor, got the schooner round into a safe place for fitting her out again for sea, and put her into such condition as to be capable of the voyage to Gloucester ; though she was not repaired, except by caulking. Shortly after, she sailed for Gloucester and arrived there safely. At Gloucester, skilful persons were employed by the plaintiffs to make the necessary repairs : They bored out some treenails and put in more bolts ; taking out, and afterwards putting in again, so much of the ceil

ing as was necessary for that purpose, and recaulked her and spiked her decks.

After these repairs, sne was seaworthy ; and a survey, called at Gloucester by the plaintiffs, for that purpose, on the 29th of November, 1837, estimated the damages done her by going ashore, which had not been repaired. She has since been constantly employed, and has performed her voyages well. She is insured at Gloucester at the same premium, and the same valuation, as in the said policy.

The items of loss, for which the plaintiffs claimed, were as follows :

1. Expenses of captain and crew at Chitecamp, for labor in getting
   off the schooner, stopping the leaks, &c. till she sailed for
   Gloucester, $ 221·00. For men's board on shore 13 days, $ 81·84,   302·84
2. Expenses incurred for labor of others, and materials used in get-
   ting her off, and damage done to a hired boat,        -        -    472·35
3. Loss on outfits,        -        -        -        -        -        42·50
4. Repairs at Gloucester,  -        -        -        -        -        -    188·03
5. Damage of hogging and strain,   -        -        -        835·00
6. Fees of survey at Gloucester,   -        -        -        -        12·00

                                             Total, $ 1852·72

A quantity of salt, a part of the outfits of the schooner, was sold at Chitecamp, to raise money to pay the expenses above named ; it being necessary to pay cash for them, and the captain having no other means of raising money. The loss to the plaintiffs, caused by this sale, was the third item of their claim.

The schooner, while on shore, was strained and badly hogged by beating upon the rocks.

The witnesses stated her to be a first rate vessel of her class. On her voyage to Gloucester she leaked badly : They had on board the crew of the schooner Roger, and two pumps were kept going half the time. The master carpenter, who repaired the vessel, stated that the whole body of the vessel was injured ; that some of her timbers were lifted ; that some of her treenails were started in the bilge, so as to come half through ; that the seams and butts were opened in several places, and that some bolts were broken and others started ; and he stated that the injury from the strain or hogging could not be perfectly repaired

except by rebuilding her.   The plaintiffs directed the carpen-
ters to repair the vessel and make her seaworthy, but to do it
economically ; stating that "they meant to keep her, and did
not want any thing out of reason to be done upon her."

The hogg remained in her after the repairs, and it was testified,
that with a hogg a vessel usually grows weaker, and that it af-
fects not only the beauty but the strength of the vessel.   The
witnesses testified that the hogg diminished the value of the ves-
sel from $ 800 to $ 1000.

The jury were instructed to consider how much the schooner
was injured in value by the effect upon her shape by the strain,
and they returned a verdict for $ 835.   This was the only point
submitted to the jury.   The counsel for the defendants contend-
ed that they were not liable for the injury, or the effect on the
value of the vessel, from the hogg or strain, and also that other
items of the loss claimed were not chargeable to general av-
erage.   Questions also arose as to contributory interests.   All
these questions are submitted to the whole court ; and assessors
are to be appointed to state the plaintiffs' claim upon the poli-
cy, upon such principles as the court may direct.

The case was argued at a former term.

*Rantoul,* for the plaintiffs.

*Ward,* for the defendants.

Putnam, J.   This was a policy on the schooner Good Hope
and appurtenances, coasting one or more fishing fares, from May
15th to November 30th, 1837.   She put into Chitecamp Harbor
on the 12th of September, expecting a storm ; and while there
she dragged her anchors and went on shore.   The crew board
ed on shore, and board was paid for them ; and by their labor,
assisted by others, the schooner was got off.   And the expenses
in Nos. 2 and 3 of the schedule, were paid to the captain and
crew and others.   By reason of the damage she had sustained, the
schooner could not pursue her course, on account of the neces-
sity of repairs ; and in such cases, those expenses are a general
average.   1 Phil. Ins. (1st ed.) 346.   *Bedford Commercial
Ins. Co. v. Parker,* 2 Pick. 1.   These expenses were incurred
within the time for which the schooner was insured, and were

incurred for the general benefit, and should be considered as general average, so far as concerns the people who were hired to assist the seamen who belonged to the schooner. *Da Costa* v. *Newnham*, 2 T. R. 407. But as the crew were not discharged, and worked as seamen, in getting off the schooner, no charge is to be allowed the assured on that account. In *De Vaux* v. *Salvador*, 4 Adolph. & Ellis, 420, it was held that the expense of wages and provisions of the crew during the time that the ship was repairing damage, which arose from collision with another ship, by perils of the sea, was not to be charged to the underwriter. The rule was laid down by Lord Mansfield, in *Fletcher* v. *Poole*, in 1769, Park on Ins. (2d Amer. ed.) 52, that sailors' wages, and provisions expended while the ship is detained to refit, are not to be allowed as a charge against the insurer So in *Robertson* v. *Ewer*, 1 T. R. 132, Buller, J. said, if the ship had been detained in consequence of an injury received in a storm, though the underwriter must have made good the damages, yet the insured could not have come upon him for the amount of wages and provisions while she was under repair. The distinction is taken, in *Da Costa* v. *Newnham*, before cited, between the labor performed by sailors who are by contract attached to the ship and bound to do service, and the labor of others hired to work for the general concern. The latter constitute an item in the general average ; the former not, unless the sailors were discharged from the ship. In such case, they, as well as others, might be employed as day laborers and be charged accordingly. The first item in the schedule cannot, therefore, be allowed.

The third item, viz. the loss in the sale of a quantity of salt, part of the schooner's outfit, which was sold at Chitecamp to raise money to pay the expenses, should be allowed in the general average ; for it was a sacrifice of that property for the good of all concerned ; as the case finds that the master had no other means of raising the money. *Orrok* v. *Commonwealth Ins. Co.* 21 Pick. 469.

In regard to the repairs made at Gloucester, one third should be deducted, new for old. And this deduction is to be made from the gross amount, as was settled in *Brooks* v. *Oriental Ins.*

*Co.* 7 Pick. 259.   The charge for the survey at Gloucester can-
not be considered as part of the loss.   7 Pick. *ubi sup.*

The most material subject of inquiry is the fifth item in the
plaintiffs' claim, namely, "damage of hogging and strain $835."
The facts relating to this claim are, that the plaintiffs repaired
the schooner in November, 1837, to the extent of making her
seaworthy ; and she has been constantly employed and has per-
formed her voyages well, and is insured at the same premium,
and at the same valuation since, as she was before she received
the damage.   But the plaintiffs had a survey called, after she
was thus repaired, to estimate the damage which had not been
repaired.   And it was proved that the whole body of the schoon-
er was injured ; that some of the timbers were lifted ; some of
her treenails started ; and that the injury from the strain or hog-
ging could not be perfectly repaired, except by rebuilding her :
That the hogging remained after the repairs, and that it affects
not only the beauty but also the strength of the vessel.   And
the damage from the hogging and strain was estimated from
$800 to $1000.

It is contended for the defendants, that this is an imaginary
damage, for which they are not responsible ; and that no such
charge has heretofore been allowed in the law of insurance.
*Sage* v. *Middletown Ins. Co.* 1 Connect. 243.   *Peele* v. *Suf-
folk Ins. Co* 7 Pick. 254.

The case is not without its difficulties.   The assured cannot
be permitted to claim for unseen and imaginary damage ; for
there can be no standard to measure the correctness of the esti
mate ; and the result would frequently be an allowance against
the insurers commensurate with the wants to make up a total
loss, wherewith to charge the underwriters.   But in the case be-
fore us, in consequence of the damage within the perils of the
policy, some of the timbers have been lifted, and a vessel,
that is found to have been one of the first class, is left, after
her repairs, so misshapen as essentially to affect her value.
There is no room for mistake about the main fact.   She is ob-
viously so much hogged as not to be perfectly repaired, unless
by rebuilding her.   She has been made seaworthy ; but it is in

evidence that she is not so strong as she would be if she were as straight as she was built.

Now the assured is entitled to an indemnity. If an insurance should be obtained upon the schooner as she now is, and a damage should happen to her, all that could be required of the underwriter would be to put her in as good a state and condition as she was when the policy was made. It could not, on any principle of indemnity, be required that she should be put in a better shape and condition. Here, at the time of the insurance, this schooner was of the first class. By the perils of the sea, she has received an injury obvious to the eye, and essentially affecting and diminishing her value. How can it be said that the plaintiffs are indemnified, if compensation should not be made for this damage?

We do not intend to shake the doctrine which we have recognized touching imaginary or theoretical strains. It may be, theoretically speaking, that whenever a ship takes the ground, all her timbers, from the keel to the water-ways, must of necessity be in some degree disjointed. But this is not such a case Here the damage is actual, visible and tangible. And if this vessel should hereafter take the ground, or encounter extraordinary seas, it is not to be expected that she would stand the shock as well as if her timbers had not been lifted and disjointed.

In the present instance, it is to be observed that there is no evidence of any design to make up a case, or to strain a point, with a view to a certain result. But the claim is put forth and proved as a real damage from the injury sustained within the perils of the policy, and is to be allowed.